**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| Bianca Raya, | |
|     *Plaintiff,* | No. 24 C 4696 |
| v. | Judge Lindsay C. Jenkins |
| Mead Johnson Nutrition Company, *et al.,* | |
|     *Defendants.* | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Bianca Raya filed a putative class action against Defendant Mead Johnson Nutrition Company and Defendant Mead Johnson & Company, LLC (collectively "Mead Johnson") alleging that at least seven types of infant formula sold by Mead Johnson contain undisclosed heavy metals. Raya was previously a named plaintiff in another putative class action filed in this district, *Lopez v. Mead Johnson Nutrition Company, et al.* (24-cv-691), bringing nearly identical claims. Plaintiffs voluntarily dismissed the *Lopez* case before motion to dismiss briefing commenced. Raya refiled her complaint, bringing the same allegations in support of her Illinois state law claims. Mead Johnson moved to dismiss the complaint in its entirety. [Dkt. 23.][1] For the reasons stated below, Mead Johnson's motion is granted in part and denied in part.

---

[1]     Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

## I.    Jurisdiction

Raya originally filed her complaint in Cook County Circuit Court, and Defendants removed it under the Class Action Fairness Act of 2005. Raya does not dispute that the parties are minimally diverse, there are plausibly more than 100 putative class members, and the amount in controversy plausibly exceeds $5,000,0000. Consequently, the CAFA requirements are met. *Schutte v. Ciox Health, LLC*, 28 F.4th 850, 854 (7th Cir. 2022).

## II.    Legal Standard

A motion to dismiss pursuant to 12(b)(1) challenges the Court's subject-matter jurisdiction, while a motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the plaintiff's claims. In both cases, the Court takes well-pleaded factual allegations as true and draws reasonable inferences in the plaintiff's favor. *Reardon v. Danley*, 74 F.4th 825, 827 (7th Cir. 2023); *Choice v. Kohn L. Firm, S.C.*, 77 F.4th 636, 638 (7th Cir. 2023). "To survive a motion to dismiss under Rule 12(b)(6), plaintiff's complaint must allege facts which, when taken as true, plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level." *Cochran v. Ill. State Toll Highway Auth.*, 828 F.3d 597, 599 (7th Cir. 2016) (cleaned up).

### III.   Background[2]

Mead Johnson is one of the primary manufacturers of infant formula in the United States and sells formula under the Enfamil® brand name. [Dkt. 1-2, ¶¶2, 34.] Its formula contains or has a material risk of containing heavy metals including arsenic, cadmium, and lead which are dangerous toxins known to pose health risks to infants. [*Id.*, ¶¶1–3, 15.] As a trusted manufacturer and vendor of essential products for babies and young children, Mead Johnson had a duty to disclose the material risks posed by the presence of heavy metals in its formula. [*Id.*, ¶¶2–3.]

Rather than disclosing this information, the packaging of Mead Johnson's formula emphasized its nutritious ingredients in order to induce customers into believing its product was of high quality and safe. [*Id.*, ¶¶3, 7–8.] The omission of information regarding the presence of heavy metals, while emphasizing the products' health benefits, was deceptive, misleading, unfair, and/or false. [*Id.*, ¶24.] Mead Johnson acted knowingly, recklessly, and/or intentionally doing so. [*Id.*, ¶¶83, 134.] This practice allowed Mead Johnson to reap enormous profits from reasonable consumers like Raya who paid a price premium for formula that did not deliver what it promised—to nourish babies. [*Id.*, ¶¶25, 32, 84, 148.]

Raya purchased two types of Mead Johnson formula: Enfamil® Gentlease and Enfamil® Nutramigen. [*Id.*, ¶29.] She relied on their packaging and believed she was feeding her child healthy and nutritious formula that was free from heavy metals.

---

[2]      The following factual allegations are taken from Raya's Complaint [dkt. 1-2] and are accepted as true for the purposes of the motion. *Smith v. First Hosp. Lab's, Inc.*, 77 F.4th 603, 607 (7th Cir. 2023). In setting forth the facts at the pleading stage, the Court does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

[*Id.*, ¶¶31–32.] She would not have purchased the formulas if Mead Johnson had fully disclosed that they contained or had a material risk of containing heavy metals. [*Id.*, ¶¶31, 147.]

Reasonable consumers, like Raya, trust manufacturers such as Mead Johnson and expect their formula to be free from the risk or presence of heavy metals, substances known to have significant detrimental health consequences. [*Id.*, ¶5.] Based on the representations on the packaging of Mead Johnson's formula and lack of warning about heavy metals, no reasonable consumer would expect the formula to contain detectable levels of arsenic, cadmium, and/or lead. [*Id.*, ¶¶11, 13.] Plaintiff's counsel performed a consumer survey, and the results confirm that consumers expect companies like Mead Johnson to test for heavy metals and disclose detectable levels of heavy metals. [*Id.*, ¶93.] The survey also confirms that the presence of heavy metals would factor into consumers' purchasing decisions. [*Id.*, ¶131,] It is possible to manufacture formula with non-detectable levels of heavy metals. [*Id.*, ¶¶101, 103.] Mead Johnson knew or should have known that it could control the amount of heavy metals in its formula to achieve non-detectable or zero levels. [*Id.*, ¶107.]

Mead Johnson was aware that its products contained or had the material risk of containing heavy metals. [*Id.*, ¶¶17, 74, 87] It has exclusive knowledge of its manufacturing processes, quality control processes, and whether its products and their ingredients contain heavy metals. [*Id.*, ¶151.] It was also aware that the presence of heavy metals in formula was material to its customers. [*Id.*, ¶¶22–23.] Through its parent company, Mead Johnson is a member of an organization which

lobbied on its behalf to oppose a California Assembly Bill which would have required infant formula manufacturers to test for and disclose the presence of heavy metals. [*Id.*, ¶94.] In opposition, the organization argued the bill would create confusion, fear, and panic among customers as well as mistrust for the manufacturers. [*Id.*]

The FDA is working on action levels related to heavy metals in baby foods but does not require disclosure of heavy metals on the packaging of products placed in the market. [*Id.*, ¶71.] Currently, there are no U.S. federal regulations setting acceptable levels of heavy metals in infant formula. [*Id.*, ¶38.] However, no level of exposure to arsenic, cadmium, and lead has been shown to be safe for infants. [*Id.*] Congressional Committee Reports acknowledge that heavy metals are present in significant levels in baby food and can endanger infant neurological development. [*Id.*, ¶73.] They can harm a baby's developing brain and nervous system and cause the permanent loss of intellectual capacity and behavioral problems like ADHD. [*Id.*, ¶40.] Due to their smaller physical size and developing brain and organs, infants and toddlers are particularly susceptible to the toxic effects of heavy metals, even in small amounts. [*Id.*, ¶¶42, 44.] Exposure to heavy metals can cause a host of medical issues leading to life-long effects. [*Id.*, ¶¶44–69.]

Raya's lawsuit encompasses the following formulas manufactured and distributed by Mead Johnson: (1) Enfamil® A.R., (2) Enfamil® Gentlease; (3) Enfamil® Enspire Gentlease; (4) Enfamil® NeuroPro; (5) Enfamil® NeuroPro Sensitive; (6) Enfamil® Nutramigen; and (7) Enfamil® ProSobee. [*Id.*, ¶37.]

The packaging of each formula was different. [*Id.*, ¶120.] All said "Brain Building expert-recommended DHA" or "Brain Building DHA." [*Id.*] Some contained other representations such as "#1 Recommended Brand by Pediatricians"; "Calcium for strong bones"; "Vitamin C for immune support"; "Immune Health supported by Lactoferrin"; "Naturally occurring MFGM components"; "Non-GMO"; "No artificial growth hormones"; "LGG® probiotic to help support digestive health"; and "Immune Health Vitamins A, C, E & Selenium." [*Id.*]

Plaintiff's counsel had the formulas tested and confirmed the presence of heavy metals at the following levels:

| Infant Formula | Arsenic (ppb) | Cadmium (ppb) | Lead (ppb) |
|---|---|---|---|
| Enfamil® A.R. | 3.4 | 3.2 | 1.2 |
| Enfamil® Gentlease | 3.7 | 2.6 | 1.7 |
| Enfamil® Enspire Gentlease | 5.0 | 2.3 | < 1.0 |
| Enfamil® NeuroPro | < 2.2 | 2.0 | < 1.0 |
| Enfamil® NeuroPro Sensitive | 5.1 | < 1.3 | 2.3 |
| Enfamil® Nutramigen | 7.9 | 4.6 | 6.5 |
| Enfamil® ProSobee | 6.7 | 6.8 | 3.5 |

[*Id.*, ¶124.][3] Independent testing also confirmed heavy metals in two products:

---

[3]     This chart and the one that follows were taken directly from Raya's complaint.

| Infant Formula | Arsenic (ppb) | Cadmium (ppb) | Lead (ppb) |
|---|---|---|---|
| Enfamil ProSobee Soy Infant Formula | 6.2* | 6.9 | 7.8 |
| Enfamil Infant – Infant Formula Milk-Based with Iron, 0-12 months | < 2.2 | 0.7* | 2.0 |

[*Id.*, ¶125.]

## IV. Analysis

In her putative class action, Raya asserts claims for (1) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS §505/1, *et seq.*) ("ICFA"), (2) breach of the implied warranty of merchantability, (3) fraudulent misrepresentation by omission, (4) fraud by omission, and (5) unjust enrichment. [*Id.*, ¶¶178–259.] She seeks actual damages, compensatory damages, and punitive damages as well as injunctive and declarative relief. [*See e.g.*, ¶¶200, 259.] Mead Johnson moved to dismiss her complaint in its entirety under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). [Dkt. 23.]

### A. Rule 12(b)(1)

Because Article III standing is a necessary component of federal jurisdiction, the Court addresses it first. *See Kithongo v. Garland*, 33 F.4th 451, 454 (7th Cir. 2022) ("The 'first and fundamental question' our court must answer 'is that of jurisdiction.'" (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998))). The doctrine of "standing is an essential and unchanging part of the case-or-controversy requirement." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). It requires that the plaintiff demonstrate that he has a "personal stake in the case" sufficient to justify

the exercise of federal judicial power. *TransUnion v. Ramirez*, 594 U.S. 413, 423 (2021).

### 1.    Standing to Pursue Injunctive Relief

"Federal courts … must assure themselves of their subject-matter jurisdiction," *Mathis v. Metropolitan Life Insurance Co.*, 12 F.4th 658, 663 (7th Cir. 2021), "regardless of the arguments advanced to them by the parties," *Macklin v. United States*, 300 F.3d 814, 819 n.5 (7th Cir. 2002) (citation omitted). Mead Johnson makes no argument about Raya's standing to pursue injunctive relief for her fraud and unjust enrichment claims. However, standing must be established for each type of relief sought. *See TransUnion*, 594 U.S. at 431 ("[S]tanding is not dispensed in gross; rather plaintiffs must demonstrate standing for each claim they press and for each form of relief they seek …").

To have standing to pursue injunctive relief, Raya must allege an impending future harm. *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 740 (7th Cir. 2014). In *Camasta*, the Seventh Circuit affirmed dismissal of the plaintiff's claim for injunctive relief, holding that past exposure to illegal conduct does not suffice to maintain a claim for injunctive relief particularly where plaintiff's allegations establish awareness of the defendant's allegedly harmful practices. *Id.* at 740–41.

Raya's allegations make clear that she is aware of the presence of heavy metals in Mead Johnson's formula and would only purchase the formula again if she could be certain that it did not contain or have a material risk of containing heavy metals. [Dkt. 1-2, ¶31.] Therefore, her allegations establish that she faces no risk of future

8

harm from Mead Johnson's products. Consequently, she lacks standing to pursue injunctive relief. *See In re Recalled Abbott Infant Formula Prod. Liab. Litig.*, 2023 WL 3585759, at *6 (N.D. Ill. May 22, 2023) (performing same analysis and dismissing claims for injunctive relief).

### 2. Standing to Sue for Unpurchased Products

Raya's complaint asserts claims related to at least seven of Mead Johnson's infant formula products. However, she alleges she purchased only two: Enfamil® Gentlease and Enfamil® Nutramigen. [*Id.*, ¶29.] Mead Johnson argues she lacks Article III standing to pursue claims related to the products she did not purchase.

There is no controlling authority establishing whether plaintiffs have standing to sue for products they did not purchase in a putative class action. *Wagner v. Gen. Nutrition Corp.*, 2017 WL 3070772, at *5 (N.D. Ill. July 19, 2017). Courts in this district do not apply a consistent approach. Some treat the issue as relating to the lead plaintiff's qualifications to be a class representative under Rule 23 and delay resolution until class certification, *see e.g.*, *Daly v. FitLife Brands, Inc.*, 2023 WL 6388112, at *6 (N.D. Ill. Sept. 29, 2023), while others consider whether the unpurchased products are "substantially similar" to purchased products and find standing when they are, *Ulrich v. Probalance, Inc.*, 2017 WL 3581183, at *6 (N.D. Ill. Aug. 18, 2017). Finally, some courts "categorically hold that class action plaintiffs never have standing with respect to products they have not purchased." *Gibson v. Albertsons Companies, Inc.*, No. 22 CV 642, 2024 WL 4514041, at *3 (N.D. Ill. Oct.

17, 2024); *see also Muir v. NBTY, Inc.*, 2016 WL 5234596, at *4 (N.D. Ill. Sept. 22, 2016).

This court joins the final group, concluding that Raya lacks standing to pursue claims for products she did not purchase. Her only economic injury relates to the Enfamil® Gentlease and Enfamil® Nutramigen products. She alleged no injury from the remaining products. Consequently, there is "no case or controversy for the federal court to resolve" with respect to the unpurchased products. *TransUnion LLC*, 594 U.S. at 423. While Raya has standing to sue for the two products she purchased, she cannot acquire standing to sue for the unpurchased products "through the back door of a class action." *Payton v. Cnty. of Kane*, 308 F.3d 673, 682 (7th Cir. 2002) ("[A] person cannot predicate standing on injury which he does not share." (quoting *Allee v. Medrano*, 416 U.S. 802, 828–29 (1974) (Burger, C.J., dissenting))).

It is inappropriate, in the Court's view, to delay resolving this question until class certification. First, Plaintiff has the burden of establishing standing throughout the case "with the manner and degree of evidence required at the successive stages of litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Second, "[w]hether [Raya] may be an adequate class representative for absent class members injured by similar products is a different question." *Sanchez v. Walmart Inc.*, 2024 WL 2132426, at *4 (N.D. Ill. May 13, 2024). Merging the Article III injury assessment with Rule 23's class certification requirements "ignores … [that they] are different questions," *Gibson*, 2024 WL 4514041, at *4 (cleaned up), and would excuse Raya from shouldering her burden at the motion to dismiss stage. "At this stage of the case,

10

there is no class and plaintiff cannot bypass the 'irreducible constitutional minimum' of Article III standing for her individual claim." *Sanchez*, 2024 WL 2132426, at *4 (quoting *Lujan*, 504 U.S. at 560). As a result, Raya's claims relating to products she did not purchase are dismissed without prejudice for lack of standing.

### B.     Rule 12(b)(6)

#### 1.     Primary Jurisdiction

Mead Johnson argues the Court should stay or dismiss Raya's case by applying the primary jurisdiction doctrine. Contrary to its name, the doctrine is not jurisdictional, but instead permissive. *United States ex rel. Sheet Metal Workers Int'l Ass'n v. Horning Invs.*, LLC, 828 F.3d 587, 592 (7th Cir. 2016). It "allows a court to refer an issue to an agency that knows more about the issue, even if the agency hasn't been given exclusive jurisdiction to resolve it." *Arsberry v. Illinois*, 244 F.3d 558, 563 (7th Cir. 2001).

While "[t]here is no fixed formula for invocation of the doctrine," *Ryan v. Chemlawn Corp.*, 935 F.2d 129, 131 (7th Cir. 1991) (citation omitted), Courts often consider the following factors when deciding whether to apply it:

> (a) whether the question at issue is within the conventional experience of judges; (b) whether the question at issue involves technical or policy issues within the agency's particular field of expertise; (c) whether a determination would involve the exercise of agency discretion; (d) the need for a consistent and uniform rule; (e) the likelihood of inconsistent rulings if not referred to the agency; (f) whether the issue has already been before the agency; (g) whether judicial economy is served by having the agency resolve the issue; and (h) whether the referral will result in substantial delay and added expense.

*Gilmore v. Sw. Bell Mobile Sys.*, L.L.C., 210 F.R.D. 212, 221 (N.D. Ill. 2001).

11

In *Ryan*, the Seventh Circuit reversed the district court's decision to apply the doctrine and refer the matter to the EPA for resolution. *Ryan*, 935 F.2d at 131. Many of the same factors that animated the *Ryan* decision are present here. First, in *Ryan* there was no claim for injunctive relief, only monetary damages. *Id*. While Raya requested injunctive relief on several claims those are dismissed for lack of standing. Given only monetary damages remain, the federal agency—EPA in *Ryan* and FDA here—are unable to provide the requested relief. *Id*. Referring Raya's complaint to the FDA would do nothing to redress her injury.

Second, in both cases the plaintiffs' suit relied on state rather than federal law. *Id*. at 132. While the subject matter of both suits—harmful chemicals in pesticides and heavy metals in infant formula—are within the purview of the EPA and FDA, "no regulation or registration provisions of the [FDA] are involved" in this lawsuit. *Id*. "Even if the plaintiff was able to show some irregularity in the [FDA's] regulation of [infant formula], such a showing would not be dispositive" of her state law claims. *Id*. at 132.

While the FDA is heavily involved in regulating baby food, including setting manufacturing and packaging standards and is aware of the presence of heavy metals in baby foods including infant formula, there are no U.S. federal regulations regarding acceptable levels of heavy metals in infant formula. [*Id.*, ¶¶38, 92, 153.] As a result, Raya's claims do not require the Court to wade into matters within the FDA's purview. Determining whether the packaging of infant formula was deceptive also does not require FDA guidance. *See In re Recalled Abbott Infant Formula Prod. Liab.*

12

*Litig.*, 2023 WL 3585759, at *7 (explaining that plaintiff's fraud, implied warranty, and unjust enrichment claims did not require her to prove any violation of FDA regulations and any forthcoming guidance from the FDA, even if it favored the manufacturer, would not be dispositive).

Consequently, the Court declines to apply the primary jurisdiction doctrine.

### 2. ICFA (Count 1)

The ICFA prohibits, among other things, "unfair or deceptive acts or practices, including … the use or employment of any deception, fraud … suppression or omission of any material fact, with the intent that others rely on the concealment, suppression or omissions of such material fact … in the conduct of any trade or commerce." 815 ILCS § 510/2. The elements of an ICFA claim are "(1) a deceptive act or practice by the defendant; (2) the defendant intended that the plaintiff rely on the deception; (3) the deceptive act occurred in a course of conduct involving trade or commerce; and (4) actual damage to the plaintiff; (5) proximately caused by the deceptive act." *Philadelphia Indem. Ins. Co. v. Chicago Title Ins. Co.*, 771 F.3d 391, 402 (7th Cir. 2014).

While Raya's complaint quotes heavily from Mead Johnson's website to establish a deceptive act, because she does not allege that she viewed the website, her ICFA claim cannot be based on those representations. She seems to recognize this, clarifying in briefing that her "main claims" are based on omissions from product packaging. [Dkt. 28 at 18.]

### a.  Safe Harbor

An action for violation of the ICFA cannot be maintained for "[a]ctions or transactions specifically authorized by laws administered by any regulatory body." §505/10b(1). "Formal rulemaking is not necessary; informal regulatory activity is enough." *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 736–37 (7th Cir. 2019) (citation and internal quotation marks omitted). Mead Johnson argues that this safe harbor applies and Raya's ICFA claim should be dismissed.

To determine whether Mead Johnson's conduct falls within the safe harbor the Court must determine what "actions or transactions" are at issue. §505/10b(1). The safe harbor only applies if those "actions or transactions" are "specifically authorized" by the FDA. Raya's ICFA claim is that Mead Johnson's omissions concerning heavy metals in infant formula made its packaging deceptive. So, the pertinent question is whether any FDA regulation authorizes manufacturers to omit these sorts of warnings.

The FDA's statutory authority includes regulation of baby foods such as infant formula, *see* 21 U.S.C. § 350a, however, the parties agree that the FDA does not regulate the amount of heavy metals in infant formula. There is also no FDA regulation requiring disclosure of heavy metals in formula. While Mead Johnson cites a myriad of FDA regulations and informal guidance (which per *Vanzant* would not suffice if they do not establish "any legally enforceable responsibilities, 934 F.3d at 737), none authorize the omission of warnings about heavy metals. Consequently, the safe harbor does not apply.

### b. Puffery

In support of their motion to dismiss, Mead Johnson argues that statements on infant formula packages are non-actionable puffery.

"Puffery is a statement of subjective description or opinion" which is "not objectively verifiable, and thus cannot be false." *Castaneda v. Amazon.com, Inc.*, 679 F. Supp. 3d 739, 749 (N.D. Ill. 2023) (citation and internal quotation marks omitted). It "typically consists of subjective descriptions relating to quality, such as 'high quality,' 'perfect,' and 'best,'" or other "meaningless superlatives that no reasonable person would take seriously." *In re Rust-Oleum Restore Mktg., Sales Pracs. & Prod. Liab. Litig.*, 155 F. Supp. 3d 772, 817 (N.D. Ill. 2016) (citations and internal quotation marks omitted).

To begin with, this argument about puffery is hard to square with Mead Johnson's assertion that many of the representations on its packaging were required by the FDA. Ultimately, the representations on formula packaging are objectively verifiable and therefore actionable.

Because Raya lacks standing to pursue claims for infant formula she did not purchase, the Court's inquiry is limited to representations on the Enfamil® Gentlease and Enfamil® Nutramigen products. The packaging of both products say "Brain Building expert-recommended DHA" or "Brain Building DHA." [Dkt. 1-2, ¶120.] Whether the formulas contained DHA and whether DHA is known to aid in brain development are both objectively verifiable. The same goes for Mead Johnson's other

representations such as "Non-GMO"; "No artificial growth hormones"; and "The only hypoallergenic formula with LGG® probiotic." [*Id.*]

Mead Johnson's claim on its packaging that its infant formulas are the "#1 Recommended Brand by Pediatricians" is also actionable non-puffery. It "is not the type of superlative that would put the reasonable consumer on notice that the comment was meaningless sales patter." *Zarinebaf v. Champion Petfoods USA Inc.*, 2022 WL 980832, at *5 (N.D. Ill. Mar. 31, 2022) (citation and internal quotation marks omitted); *see also Bietsch v. Sergeant's Pet Care Prod., Inc.*, 2016 WL 1011512, at *4 (N.D. Ill. Mar. 15, 2016) (Because Sergeant's packaging conveys to a consumer that the Pur Luv Treats are safe, wholesome, and digestible, the representations cannot be said to be puffery.")

### c.  Materiality

Mead Johnson argues the omission from formula packaging regarding heavy metals was not materially misleading. Raya's theory is that, by calling out healthy ingredients on packaging, Mead Johnson conveyed that its product was safe and nutritious when it was not, due to the presence of heavy metals. *See id.* at *8. [Dkt. 1-2, ¶116.] To maintain an ICFA claim based on omissions, the omission must be on a communication from the defendant, *O'Connor v. Ford Motor Co.*, 477 F. Supp. 3d 705, 720 (N.D. Ill. 2020), and it must have been "employed as a device to mislead," *Zarinebaf*, 2022 WL 980832, at *10.

Raya's allegations suffice on both fronts. First, she identifies the particular statements on the packaging in question, arguing that in context, and in absence of

a warning label, they are misleading. Second, she alleges that Mead Johnson intentionally packaged its products in this misleading way. [*Id.*, ¶134.]

On the materiality front, with support from survey information, Raya alleges that customers would not believe, based on Mead Johnson's product packaging, that its formula contains heavy metals. [*Id.*, ¶131 (77.8% of survey respondents affirmed that after seeing the formula label they would not expect the product to contain heavy metals)]; *see Jackson v. Kraft Heinz Foods Co.*, 2022 WL 4591749, at *3 (N.D. Ill. Aug. 3, 2022) (finding plaintiff failed to plausibility plead a deceptive act concerning labeling of Bagel Bites because she failed to allege that reasonable consumers of Bagel Bites would not expect mozzarella, real cheese, and tomato sauce to contain undisclosed additives). Furthermore, Raya alleges that the presence or material risk of heavy metals was material to her and other purchasers of infant formula.

Those allegations are sufficient to survive a motion to dismiss and also meet the Federal Rule of Procedure 9(a) pleading standard for allegations of fraud. *Vanzant*, 934 F.3d at 735.

### d.    Unfair Acts

In addition to her ICFA fraud claim based on Mead Johnson's alleged omissions, Raya makes a claim, relying on the same allegations, for unfair acts. She asserts that Mead Johnson's deceptive packaging constitutes "false advertising."

Unfair Act claims under the ICFA are guided by three considerations: "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers. A

court may find unfairness even if the claim does not satisfy all three criteria." *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 669 (7th Cir. 2008) (cleaned up). While Raya's complaint does not contain any explicit allegations about public policy, morality, or ethics, the Seventh Circuit explained that is permissible, as long as "it alleges conduct that, if proven, could support this statutory definition of unfairness." *Id.* at 672.

Raya's complaint alleges that Mead Johnson knowingly permitted its formula to contain heavy metals and knew that heavy metals have a negative impact on infant development. Particularly given notice pleading standards for unfair acts claims under the ICFA, Raya has done enough to survive a motion to dismiss. *Id.* at 670.

### e.    Actual Damages

For either a fraud or unfair acts claim under the ICFA, plaintiff must allege actual pecuniary loss. *Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010). Mead Johnson quibbles that Raya has not done enough to allege monetary damages and, in any event, "she paid for what she got: safe, healthy, and effective infant formula." [Dkt. 23 at 26.]

Addressing Mead Johnson's second point first, at the motion to dismiss stage Raya's allegation that she did not receive the full benefit of what she paid for must be accepted. *Johnson v. Enhanced Recovery Co., LLC*, 961 F.3d 975, 980 (7th Cir. 2020); *Meriwether v. Faulkner*, 821 F.2d 408, 413 (7th Cir. 1987) (explaining that an argument "challenging the factual allegations contained in plaintiff's complaint[] may not be made on a motion to dismiss, where … the plaintiff's allegations must be

accepted as true"). She alleged in detail that the heavy metals in Mead Johnson's formula had the potential to significantly harm babies' development. [Dkt. 1-2, ¶¶1–3, 15, 40.]

As for the sufficiency of her allegations, Raya describes her harm in two different ways: (1) that she did not receive the benefit of her bargain and (2) that she paid a price premium for Mead Johnson's product. Regardless, her allegations boil down to an assertion that she paid more than the product was worth. [*Id.*, ¶¶25, 32, 84, 148.] That is a commonly accepted theory of actual pecuniary loss under the ICFA. *Kim,* 598 F.3d at 365 (explaining that "actual loss may occur if the seller's deception deprives the plaintiff of the benefit of her bargain by causing her to pay more than the actual value of the property" (citation and internal quotation marks omitted)); *cf. Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 648 (7th Cir. 2019) (affirming dismissal of ICFA claim where plaintiffs did not allege "that the seven ounces of chocolate … were worth less than … they paid").

Contrary to Mead Johnson's suggestion, Raya need not plead specific factual allegations about how much she paid or whether she could have bought better formula for a lower price. [Dkt. 29 at 8–9.] *See Freeman v. MAM USA Corp.*, 528 F. Supp. 3d 849, 865 (N.D. Ill. 2021) ("As a consumer who actually bought the product, [Plaintiff] can (and has) simply alleged that she suffered actual pecuniary loss because she allegedly paid more than the product was worth and thus did not receive the benefit of her bargain." (cleaned up)). Mead Johnson's motion to dismiss Raya's ICFA claims fails.

### 3.    Implied Warranty of Merchantability (Count II)

Mead Johnson moves to dismiss Raya's claim for breach of the implied warranty of merchantability, arguing that Raya failed to provide the required pre-suit notice. *See* 810 ILCS §5/2-607(3)(a). Raya admits she did not give pre-suit notice but argues that because Mead Johnson was otherwise on notice any lapse should be overlooked.

Illinois courts recognize only two exceptions to the notice requirement. First, notice may be excused where the seller has "actual knowledge of the alleged breach of the particular products purchased by the named plaintiffs in this lawsuit." *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 590 (1996). Second, where the plaintiff suffers a personal injury, filing a lawsuit can suffice for pre-suit notice. *Andrews v. Carbon on 26th, LLC*, 244 N.E.3d 365, 375, *appeal allowed sub nom. Andrews*, 244 N.E.3d 233 (Ill. 2024), and *appeal allowed sub nom. Andrews*, 244 N.E.3d 267 (Ill. 2024). This exception does not apply to claims for only economic losses. *Id.*

Neither exception is applicable to Raya's case. Raya argues that the *Lopez* suit, in which she was a named plaintiff, suffices for pre-suit notice. That is a nonstarter. Raya was "aware of the conduct serving as the basis for the breach of [implied] warranty [claim] when [s]he filed h[er] initial pleading, so [s]he was obligated to provide notice prior to filing suit." *Counts v. Arkk Food Co.*, 2023 WL 7281851, at *5 (N.D. Ill. Nov. 3, 2023) (citing *Jones v. Apple, Inc.*, 2016 WL 11647699 (S.D. Ill. Aug. 22, 2016)). While the *Andrews* case currently on appeal held that a third-party lawsuit could establish notice by "caus[ing] a … seller to have actual knowledge of a

defect in the goods at issue," *Andrews* does not support Raya's argument that her own prior lawsuit can establish notice. *See Andrews*, 2024 IL App (1st) 231369, ¶ 45. Because Raya's lawsuit is for economic damages only, not personal injury, the second exception is also inapplicable.

Raya is correct that there are several justifications for the pre-suit notice requirement including (1) protecting the seller's ability to investigate the breach and gather evidence, (2) allowing a seller to cure the defect and/or minimize damages, and (3) to encourage pre-suit settlement." *Oettle v. Walmart, Inc.*, 685 F. Supp. 3d 706, 710 (S.D. Ill. 2023). But even if the *Lopez* lawsuit accomplished some of the purposes of pre-suit notice, it does not eliminate the need for notice. *See Hamidani v. Bimbo Bakehouse LLC*, 2023 WL 167513, at *4 (N.D. Ill. Jan. 12, 2023) (dismissing breach of warranty claims where plaintiff failed to give pre-suit notice). For example, it did nothing to encourage pre-suit settlement. Permitting an earlier lawsuit from the same plaintiff to satisfy the pre-suit notice requirement would open the door for gamesmanship, *see Counts*, 2023 WL 7281851, at *5, and allow plaintiffs to circumvent the requirement entirely. Most importantly, Illinois courts have given no indication that this sort of notice is permissible.

Given Raya's failure to allege legally sufficient notice in her complaint, her breach of implied warranty claim is dismissed.

### 4.    Fraud Claims (Counts III & IV)

Raya brings two fraud claims which she titles "fraudulent misrepresentation by omission" and "fraudulent omission." Substantially similar allegations support both claims and it is unclear from her complaint (and the parties' briefing) how the two causes of action differ. The Court's own research did not uncover guidance from Illinois' courts. Nevertheless, Mead Johnson makes the same arguments for dismissal of both claims so the Court will consider them together.

### a.    Duty to Disclose

The parties agree that both causes of action depend on whether Mead Johnson had a duty to disclose. S*ee Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593 (1996) ("[A] plaintiff must allege that the defendant concealed a material fact when he was under a duty to disclose."); *Al Maha Trading & Contracting Holding Co. v. W.S. Darley & Co.*, 936 F. Supp. 2d 933, 945–46 (N.D. Ill. 2013) ("[T]o prove fraud by the omission of a material fact, it is necessary to show the existence of a special or fiduciary relationship, which would raise a duty to speak." (citation omitted)).

A duty can arise in several situations, including where plaintiff places trust and confidence in the defendant thereby placing the defendant in a special position of influence, *Connick*, 675 N.E.2d at 593, or where a defendant's concealment results in the presentation of half-truths, *Crichton v. Golden Rule Insurance Co.*, 576 F.3d 392, 398 (7th Cir. 2009).

### 1.    Special Relationship

"To establish the existence of a special relationship giving rise to a duty to disclose, the defendant must be clearly dominant, either because of superior knowledge of the matter derived from ... overmastering influence on the one side, or from weakness, dependence, or trust justifiably reposed on the other side." *In re Boeing 737 MAX Pilots Litig.*, 638 F. Supp. 3d 838, 863 (N.D. Ill. 2022) (quoting *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 572 (7th Cir. 2012)).

Raya alleges in her complaint that Mead Johnson has "exclusive and/or superior knowledge about the presence or material risk of Heavy Metals." [Dkt. 1-2, ¶82.] She also alleges she placed trust in Mead Johnson. [*Id.*, ¶216.]

The *Boeing* court found no special relationship existed between the plane manufacturer and its customers under Illinois law despite plaintiffs' allegations that they had a "special relationship" with Boeing because they placed trust in the company and it was in a position of superiority. *In re Boeing 737 MAX Pilots Litig.*, 638 F. Supp. 3d at 863. It discussed Illinois cases on the topic, including *Wisniewski v. Diocese of Belleville*, 943 N.E.2d 43, 74 (2011) and *Doe v. Boy Scouts of America*, 66 N.E.3d 433, 457 (Ill. App. Ct. 2016). In *Wisniewski* the Illinois court found the Diocese owed minor members a duty by virtue of the special relationship between them. 943 N.E.2d at 75, 89 (special relationship by virtue of "central role" the Diocese played in plaintiff's life including teachings to obey Diocese leaders.) In *Boy Scouts of America*, the Court found a question of fact on the same issue, indicating that there was enough evidence for a jury to find a similar special relationship between minor members and

the Boy Scouts, leading to a duty to disclose leaders' history of sexual misconduct. 66 N.E.3d at 459.

The *Boeing* court found neither decision instructive because they did not suggest Illinois courts would expand the "special relationship duty" to plane manufacturers and their customers. *In re Boeing 737 MAX Pilots Litig.*, 638 F. Supp. 3d at 864. It believed doing so would impermissibly expand the doctrine to include "car companies, pharmaceutical companies, and so on." *Id.* While those sorts of companies "have influence and superiority," they do not give rise to a special relationship, the *Boeing* court surmised, because "[o]therwise, special relationships would appear all over the place." *Id.*

The *Abbott Infant Formula* court had a different perspective and found plaintiffs had alleged a duty to disclose sufficiently to survive a motion to dismiss. *In re Recalled Abbott Infant Formula Prod. Liab. Litig.*, 2023 WL 3585759, at *10 (N.D. Ill. May 22, 2023). However, Abbott failed to argue (and therefore waived any argument) that it lacked a duty under the laws of any particular state. *Id.* (plaintiffs brought a putative nation-wide class action). Furthermore, because the *Abbott* court did not analyze the claim under any particular state law, it accepted that duty could be premised the defendants' possession of "special knowledge of material facts to which the other party does not have access." *Id.*

Raya has not cited any Illinois case holding that a defendant's special knowledge of material facts can give rise to a "special relationship" and a duty to disclose. Given that in almost every commercial transaction the defendant has

24

greater knowledge about its product than the end-user, as the *Boeing* court suggests such a holding would greatly expand the number of "special relationships."

Although this case involves children like *Wisniewski* and *Boy Scouts of America*, the nature of the relationship between minors and the organization or company is quite different. While the minors in *Wisniewski* and *Boy Scouts* had a close interpersonal relationship encouraged by the organization, there are no similar allegations with respect to Mead Johnson. Instead, it was an arms-length consumer product transaction not involving bodily injury. Because there is no indication that Illinois courts would find a special relationship on these allegations, this Court declines to find one existed between Raya and Mead Johnson.

### 2. Half-Truths

Even without a special relationship, Mead Johnson may have had a duty to disclose information about heavy metals in its products if it "ma[d]e[] an affirmative statement that it passe[d] off as the whole truth while omitting material facts that render[ed] the statement a misleading 'half-truth.'" *Crichton*, 576 F.3d at 398 (citing *Heider v. Leewards Creative Crafts, Inc.*, 613 N.E.2d 805, 814 (1993)). A half-truth is "a disclosure that is misleading because it omits important information." *Apotex Corp. v. Merck & Co.*, 229 F.R.D. 142, 149 (N.D. Ill. 2005).

Putting aside representations Mead Johnson made on its website, as Raya did not view those, and representations made on the packages of products she did not purchase, only certain of them remain: (1) "Brain Building expert-recommended DHA" or "Brain Building DHA"; (2) "Non-GMO"; (3) "No artificial growth hormones";

(5) "The only hypoallergenic formula with LGG® probiotic"; and (6) the "#1 Recommended Brand by Pediatricians." [Dkt. 1-2, ¶120.]

None of these assertions are half-truths due to Mead Johnson's failure to disclose information about heavy metals. For example, the presence of heavy metals in Mead Johnson's formula does not make the fact that the formula is "non-GMO" untrue.

The closest Raya comes is with the "brain building" claims. She alleges that heavy metals have the opposite effect on brain development in young children. [*See* Dkt. 1-2, ¶16.] However, Mead Johnson's representation was not that its formula was brain building but that an ingredient in its formula—DHA—was beneficial for brain development. The presence of heavy metals in the formula doesn't make Mead Johnson's statement that its formula contains DHA, an acid beneficial to brain development, a half-truth.

Furthermore, none of Mead Johnson's representations were presented as "a comprehensive explanation" of all the benefits and detriments of the formula. *Crichton*, 576 F.3d at 398. That is, it didn't present these statements "as the whole truth." *Id.*; *Heider*, 613 N.E.2d at 811 (explaining that defendant's representation that substance was "not a problem" was a half truth where defendant knew substance contained asbestos and, although it was "well below the allowable OSHA standard," the defendant's representation omitted that "there was the problem of potential release of asbestos into the warehouse environment.") Even considering all the statements together, Mead Johnson did not suggest or indicate that the colorful

26

callouts on its formula packaging represented a full description of its contents. *Apotex Corp. v. Merck & Co.*, 229 F.R.D. 142, 149 (N.D. Ill. 2005) (defendant's explanation of how to make Vasotec was not a half truth where it was incomplete but defendant never represented that his "explanation [was] a detailed, blow-by-blow description.")

Because there is no basis to find that Mead Johnson had a duty to disclose information about the presence or risk of the presence of heavy metals in its formula, both Raya's fraud claims are dismissed without prejudice.[4]

## V.    Conclusion

For the reasons stated above, Mead Johnson's motion to dismiss [Dkt. 23.] is granted in part and denied in part. Raya's breach of implied warranty of merchantability and her fraud claims are dismissed without prejudice. Mead Johnson's motion to dismiss is otherwise denied.

Enter: 24-cv-4696
Date:  December 2, 2024

_____
Lindsay C. Jenkins
United States District Judge

---

[4]    Mead Johnson moved to dismiss Raya's remaining claim for unjust enrichment (Count V) but its only argument was that if Raya's other claims are dismissed the unjust enrichment claim could not remain. Since Raya's ICFA survives so too can her unjust enrichment claim.